COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

)
MICHAEL JACQUES,                                       )                  No. 08-02-00491-CR
)
                                    Appellant,                        )                              Appeal from
)
v.                                                                          )                  168th District Court
)
THE STATE OF TEXAS,                                   )                  of El Paso County, Texas
)
                                    Appellee.                          )                  (TC# 20020D03178)
                                                                             )


O P I N I O N

            Michael Jacques appeals his conviction for capital murder. Appellant pled not guilty, was
convicted by a jury and sentenced to life in prison. We affirm.
FACTUAL SUMMARY
            On the evening of Friday, March 10, 2000, 18-year-old Sophia Martinez left her house in her
red 2000 Grand Am GTS around 10:15 p.m. on her way to a nightclub in El Paso. The next
morning, her sister Mary Ann went to wake her for work but Sophia was not in her room. Mary Ann
thought that Sophia had gotten up early and already left the house. When she received a call around
10:30 or 11 a.m. advising her that Sophia had not shown up for work, Mary Ann began making calls
and trying to locate her sister. The New Mexico State Police then called to report that her sister’s
car had been found but Sophia was missing. Her body was found the next day.
            Officer Leticia Olivas of the El Paso Police Department was one of the crime scene
technicians assigned to the murder case. On March 12, she went to the desert area off Junction 404
and O’Hara Road in New Mexico to recover Sophia’s car. By the time she arrived, the car had been
towed but she documented and photographed the area. She observed tire impressions leading into
and out of the area and tennis shoe impressions leading toward the highway.


 Olivas then went to
the New Mexico State Troopers’ garage in Las Cruces where the vehicle was stored. She took
interior and exterior pictures of the car. There were blood stains on the seats, the interior door
panels, the steering wheel, the driver’s seat belt, and the rearview mirror. The passenger side
window was shattered and broken out. From there, Olivas headed to northeast El Paso where
Sophia’s body had been located. She had been shot five times in the head and face. One wound was
on the right side of the back of her head, one through the center of her right eye, one through her
right cheek next to her nose, and one to her left cheek. Sophia also received a grazing wound
through her left eyebrow area. The medical examiner recovered four bullets and concluded that
Sophia died as a result of brain injury from multiple gunshots. A fifth bullet was found in the
vicinity where the body was discovered. Sophia’s body also tested positive for sperm which was
later matched to William Berkley, Appellant’s co-defendant. A toxicology report was negative for
drugs and alcohol. 
            During their investigation, police found an ATM receipt in Sophia’s car and obtained the
video surveillance tapes from the Government Employees Credit Union (GECU) on Viscount, where
Sophia banked. The video showed that at 10:22:35 p.m. on March 10, Sophia approached the ATM
and withdrew $20. At 10:24:05 p.m., an individual later identified as Berkley approached the
passenger side of Sophia’s car with his arms extended. He pointed a pistol at Sophia at
10:24:09 p.m. and the passenger side window shattered. Berkley then moved around to the driver’s
side and got into the backseat. A bleeding Sophia withdrew $200 from her account at 10:25:15 p.m. 
The video showed only one perpetrator; no other cars followed Sophia’s car as it left the bank. 
            Sophia’s murder generated a great deal of public interest and was featured on Crime Stoppers
and America’s Most Wanted. A reward was offered for information in the case. On September 30,
2000, Heather Jacques,


 Appellant’s wife, contacted the FBI with information about Sophia’s death.


 
Police then contacted Appellant, who was in the El Paso County jail on an unrelated charge, and
questioned him concerning Sophia’s murder. Appellant ultimately gave two written statements. 
            According to these statements, Appellant was visiting Heather at the hospital on March 10
when his friend William Berkley arrived. Heather had been hospitalized for a kidney infection,
although the record is unclear as to the actual date of her admission.


 Heather needed some personal
items and Appellant and Berkley went to the couple’s apartment, which at that time was number 34
at the Amberwood Apartments. The men returned to the hospital and Berkley left, but he came back
around 7 p.m. Appellant told Berkley that he needed money to pay his court costs and Berkley said
he would take care of it. He asked whether Appellant wanted to break into a house. They began
discussing different ways of getting the money and Berkley finally suggested a hold-up at an ATM. 
Before leaving the hospital, Berkley stole some surgical gloves and KY jelly. 
            The men then drove back to the Amberwood Apartments to visit Berkley’s friend, Amanda
Cepolski, who lived in apartment no. 134. Berkley talked to Amanda for ten to fifteen minutes
before returning to the car. He showed Appellant a black .22 caliber revolver, a black pullover
sweater, and a black beanie cap. They began driving around looking for possible hold-up locations. 
They considered the GECU in northeast El Paso, but Berkley thought the area was too well lit with
too much traffic. They went to a grocery store on Fairbanks Street but didn’t like that scenario
either. Finally, they targeted the GECU on Viscount. Here, the lighting was poor and they parked
by a rock wall fence close to the street running behind the bank. From this vantage point, Appellant
could clearly see the ATMs. Berkley got out to hide in the bushes and wait for a car, and Appellant
moved over to the driver’s seat. Berkley donned the black sweater, beanie cap, and surgical gloves,
and took the gun with him. Appellant also put on a pair of gloves. 
            Cars were coming and going at the ATM booths. When Appellant saw a new model car pull
up, he flashed the headlights. Berkley emerged from the bushes and approached the car. Appellant
couldn’t see what Berkley did until he walked around to the driver’s side. The car took off, and
when Berkley didn’t return, Appellant realized he had left in the red car. Appellant drove back to
the hospital around 10:45 or 11 p.m. and told his wife that Berkley had just robbed someone at an
ATM. Around 2 or 2:30 a.m., a nurse came into the hospital room and told Appellant that a friend
was waiting downstairs. 
            Appellant went downstairs and met Berkley. Sophia’s car was in the parking lot and the right
front passenger side window was shattered. Berkley told Appellant that he had tried to open the
passenger door but it was locked. He tried to break the window with the butt of the gun but it
wouldn’t break. He fired a shot, but the window only shattered. When he went around to the
driver’s side, he saw that the driver had been shot in the face. Berkley told her to open the automatic
locks, and he got in the backseat. As Sophia tried to drive off, Berkley put the gun to her head and
told her to withdraw $200. He then instructed her to drive to a secluded desert area that Appellant
and Berkley called “the spot.” When they arrived, Berkley told her to get out of the car. He shot her
in the face twice, and she fell to the ground. Berkley then emptied the gun into her while she was
lying on the ground. 
            Berkley had come back to the hospital because he needed Appellant’s help in getting rid of
the car. Appellant told his wife he had to leave again. Berkley drove Sophia’s car while Appellant
followed in Berkley’s car. They drove out to the junction of Chaparral and O’Hara Road and turned
westbound on O’Hara. Berkley passed through a cattle fence and ended up on a dirt mound. It was
very dark and difficult to see, so much so that Appellant passed by Berkley without seeing him. He
turned around and kept driving, finally coming upon Berkley walking along the road. Appellant
picked him up. 
            A few days later, Appellant and his wife were having a barbecue at their apartment. Berkley
stopped by and had Sophia’s driver’s license and car keys with him. Berkley put the license on the
grill to burn, and Appellant took the keys and threw them on the roof of the apartment complex. 
            Appellant also provided information about the gun. The last time he had seen it was in May
2000. It was located at Berkley’s father’s house in the night stand by the bed. And as it turned out,
Appellant’s court costs of approximately $200--the underlying reason for the robbery--were paid in
$20 denominations after the murder. 
            Based on this information, the police executed a search warrant at Berkley’s father’s home
and recovered a .22 caliber eight-shot revolver in the nightstand of the master bedroom. They also
recovered Sophia’s keys from the roof of one of the buildings at the Amberwood complex and
located metal fragments in apartment no. 34, Appellant’s former apartment. At trial, Sally Grew,
a FBI firearms and tool marks examiner, testified that she was not able to determine for sure whether
the recovered bullets were fired from the revolver, but it was possible. As for the metal fragments,
Grew was not able to determine much of anything. Visually the bullets appeared similar because
they had a brassy-colored coating, and some of the bullet fragments also had brassy colored coating
on them. Diana Grant, FBI forensic examiner specializing in bullet lead analysis, testified that she
found four of the bullets and the metal fragments to be analytically indistinguishable and chemically
similar. They were likely to have originated from the same source of molten lead, although that
didn’t necessarily mean that the bullets came from the same box of ammunition. The fifth bullet was
analytically distinguishable, but possessed only a subtle difference. 
            Douglas Richard Bosanko, who owned a wrecker and locksmith business, testified at trial
that on March 10, he was called out on a business call at Graham’s Nightclub on the westside of
El Paso. He left from Chaparral, New Mexico and traveled up Lisa over War Road onto
O’Hara Road, then to Interstate 10 and Artcraft. As he was crossing over O’Hara Road, he saw a
car twenty-five to thirty feet off the road, and the dome light came on as he was passing. Bosanko
saw someone get out of the vehicle. On his way home from the call, he saw the car was still there,
but he did not see anyone. At the end of the Gap and Highway 54, Bosanko saw a Hispanic male
pacing back and forth over the right-hand side of the road, so he pulled over and asked if he needed
help. The male answered “No, bro,


 everything’s cool.” The male said that he was waiting on a
friend to pick him up. Bosanko saw him continue to walk along the shoulder toward El Paso. Later,
Bosanko identified an individual who was not Berkley. He was also later shown two photo line-ups
but he was not able to identify anyone. He did, however, positively state that Appellant was not the
man he had seen.
            Appellant was charged by indictment for capital murder under Texas Penal Code
Section 19.03(a)(2): 
[O]n or about the 10th day of March, 2000 and anterior to the presentment of this
indictment, in the County of El Paso and State of Texas, MICHAEL JACQUES,
hereinafter referred to as Defendant, did then and there intentionally cause the
death of an individual, namely, SOPHIA MARTINEZ by shooting the said
SOPHIA MARTINEZ with a firearm, and the Defendant was then and there in the
course of committing and attempting to commit the offense of Aggravated Robbery, 
 
And the Grand Jurors do further present that the said defendant did use and exhibit
a deadly weapon, to wit: a firearm, during the commission of and immediate flight
from said felony offense.

LAW OF PARTIES
            A person commits the offense of capital murder if he commits murder as defined under
Section 19.02(b)(1), and intentionally commits the murder in the course of committing or attempting
to commit robbery. See Tex.Penal Code Ann. § 19.03(a)(2)(Vernon Supp. 2004). Under
Section 7.02(a)(2), a person is criminally responsible for an offense committed by another if “acting
with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids,
or attempts to aid the other person to commit the offense.” See Tex.Penal Code Ann. § 7.02(a)(2)
Vernon 2003). In a capital murder case, the jury must find that the party-defendant intended to cause
the murder. See Duke v. State, 950 S.W.2d 424, 427 (Tex.App.--Houston [1st Dist.] 1997, pet.
ref’d). Under Section 7.02(b), a person is criminally responsible for an offense committed by
another: 
If, in the attempt to carry out a conspiracy to commit one felony, another felony is
committed by one of the conspirators, all conspirators are guilty of the felony actually
committed, though having no intent to commit it, if the offense was committed in
furtherance of the unlawful purpose and was one that should have been anticipated
as a result of the carrying out of the conspiracy.

Tex.Penal Code Ann. § 7.02(b).

            The court’s charge to the jury contained only the law of parties as provided under
Section 7.02(a):
Now bearing in mind the foregoing instructions, if you believe from the
evidence beyond a reasonable doubt that on or about the 10th day of March, 2000,
in El Paso County, Texas, that WILLIAM BERKLEY did then and there intentionally
and knowingly cause the death of the individual, namely, SOPHIA MARTINEZ by
shooting the said SOPHIA MARTINEZ with a firearm, and the Defendant was then
and there in the course of committing or attempting to commit the offense of
aggravated robbery, and that the said Defendant did use or exhibit a deadly weapon,
to wit: a firearm, during the commission of or immediate flight from said felony
offense, and if you further believe from the evidence beyond a reasonable doubt that
on or about the 10th day of March, 2000, in El Paso County, Texas, that MICHAEL
JACQUES as a party as that term had been here and before defined, solicits,
encourages, directs, aids or attempts to aid the said WILLIAM BERKLEY in the
foregoing action, you will find the said MICHAEL JACQUES guilty of Capital
Murder, as charged in the indictment. (Verdict Form ‘A’)
 
Unless you so find beyond a reasonable doubt, or if you have a reasonable
doubt thereof, you will acquit the Defendant, MICHAEL JACQUES, of Capital
Murder as alleged in the indictment (Verdict Form ‘B’) and next consider if the
Defendant, MICHAEL JACQUES, is guilty of Aggravated Robbery.

            In determining whether a defendant participated in an offense as a party, the court may
examine the events occurring before, during, and after the commission of the offense, and may rely
on actions of the defendant that show an understanding and common design to commit the offense. 
King v. State, 29 S.W.3d 556, 564 (Tex.Crim.App. 2000). In order to establish guilt under
Section 7.02(a)(2), the State had to prove Appellant’s specific intent to promote or assist Berkley in
Sophia’s murder. See Tippitt v. State, 41 S.W.3d 316, 324 (Tex.App.--Fort Worth 2001, no pet.).
The jury can rely upon circumstantial evidence and infer intent from Appellant’s acts, words, or
conduct. See Ransom v. State, 920 S.W.2d 288, 302 (Tex.Crim.App. 1994). If there is no direct
evidence of intent, the jury can use collective common sense and apply common knowledge and
experience gained in ordinary affairs to draw reasonable inferences from the evidence as to
Appellant’s intent. See Rodriguez v. State, 90 S.W.3d 340, 355 (Tex.App.--El Paso 2001, pet. ref’d). 
SUFFICIENCY OF THE EVIDENCE
            In his first two points of error, Appellant complains that the evidence is legally or factually
insufficient to sustain his capital murder conviction. Referring to his statements, he contends he
admitted only to participation in an armed robbery; he never admitted that murder, rape,


 or
kidnaping was part of the plan. He emphasizes that he did not use a weapon and was not present
when the gun was used nor when Sophia was murdered. He was merely the getaway driver for the
robbery. He further argues that because the jury was not instructed under Section 7.02(b) as to
conspiracy, we cannot affirm on that basis and that even if the conspiracy theory under
Section 7.02(b) is properly considered in examining the sufficiency of the evidence, Berkley’s
actions constituted an “independent impulse” negating the conspiracy theory.
Standard of Review
            In reviewing the legal sufficiency of the evidence to support a criminal conviction, we must
review all the evidence in the light most favorable to the verdict to determine whether any rational
trier of fact could have found the essential elements of the offense beyond a reasonable doubt. 
Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); Geesa
v. State, 820 S.W.2d 154, 159 (Tex.Crim.App. 1991), overruled on other grounds, Paulson v. State,
28 S.W.3d 570 (Tex.Crim.App. 2000); Hernandez v. State, 946 S.W.2d 108, 110-11 (Tex.App.--El
Paso 1997, no pet.). We do not resolve conflicts of fact or assign credibility to the witnesses, as it
was the function of the trier of fact to do so. See Adelman v. State, 828 S.W.2d 418, 421
(Tex.Crim.App. 1992); Matson v. State, 819 S.W.2d 839, 843 (Tex.Crim.App. 1991); Lucero v.
State, 915 S.W.2d 612, 614 (Tex.App.--El Paso 1996, pet. ref’d). Instead, our duty is only to
determine if both the explicit and implicit findings of the trier of fact are rational by viewing all of
the evidence admitted at trial in a light most favorable to the verdict. Adelman, 828 S.W.2d at 422. 
In so doing, any inconsistencies in the evidence are resolved in favor of the verdict. Matson, 819
S.W.2d at 843; Lucero, 915 S.W.2d at 614. 
            When conducting a review of the factual sufficiency of the evidence, we consider all of the
evidence, but we do not view it in the light most favorable to the verdict. See Clewis v. State, 922
S.W.2d 126, 129 (Tex.Crim.App. 1996); Levario v. State, 964 S.W.2d 290, 295 (Tex.App.--El Paso
1997, no pet.). We will set aside the verdict only if it is so contrary to the overwhelming weight of
the evidence as to be clearly wrong and unjust. See Levario, 964 S.W.2d at 295. We cannot
substitute our conclusions for those of the jury, nor may we interfere with the jury’s resolution of
conflicts in the evidence or pass on the weight or credibility of the witness’s testimony. See id.
Where there is conflicting evidence, the jury’s verdict on such matters is generally regarded as
conclusive. See id.
Analysis of the Evidence
            The evidence clearly established that Berkley was the shooter. Accordingly, Appellant could
not have intentionally caused her death by shooting her with a deadly weapon, and the evidence is
legally insufficient to support his conviction as a primary actor. See Cisneros v. State, 915 S.W.2d
217, 222 (Tex.App.--Corpus Christi, pet. ref’d); Tippit, 41 S.W.3d at 323. Therefore, the jury must
have concluded that during the course of the robbery, Appellant intentionally promoted or assisted
in the murder. See Tex.Penal Code Ann. § 7.02(a)(2).
            Appellant claims that neither his nor Heather’s statements establish that he intended for
Sophia to be murdered. In support of this argument, he directs our attention to Tippitt. See Tippitt,
41 S.W.3d at 316. There, the court of appeals found that the evidence only established a plan to rob
the victim, not to murder him. Id. at 324. The court also found no evidence to show that the
defendant knew the shooter had a gun when he entered the victim’s house. Id. at 325-26. 
Consequently, the court concluded that the evidence was insufficient to show that Tippitt should
have anticipated murder as a possible result of the agreement to rob the victim. Id. at 326. 
            Here, Appellant admitted knowing that Berkley had a gun. He helped Berkley dispose of
Sophia’s car and keys. From the metal fragments found in Appellant’s apartment, the jury could
infer that Berkley and Appellant test-fired the weapon before leaving for the ATM which bears
directly on Appellant’s specific intent for Berkley to use the gun during the robbery. See Barnes v.
State, 56 S.W.3d 221, 238 (Tex.App.--Fort Worth 2001, pet. ref’d); Holiday v. State, 14 S.W.3d 784,
789-90 (Tex.App.--Houston [1st Dist.] 2000, pet. ref’d), cert. denied, 532 U.S. 960, 121 S.Ct. 1491,
149 L.Ed.2d 377 (2001)(holding that a jury can reasonably infer intent to kill from the use of a
deadly weapon).
            It was within the jury’s discretion to disregard Appellant’s statements that he never intended
for Sophia to be murdered. See Hanson v. State, 55 S.W.3d 681, 691-92 (Tex.App.--Austin 2001,
pet. ref’d). Viewing the evidence in the light most favorable to the jury’s verdict, we conclude that
the evidence supports the jury’s finding that Appellant had the specific intent to kill Sophia in the
commission of the robbery. With regard to the factual sufficiency complaint, we do not find the
verdict to be so contrary to the overwhelming weight of the evidence as to be clearly wrong and
unjust.
Applicability of Section 7.02(b)
            We now address Appellant’s contention that we cannot affirm his conviction based on a
conspiracy theory under Section 7.02(b). In support of this argument, he relies upon Malik v. State,
953 S.W.2d 234 (Tex.Crim.App. 1997). In Malik, the Court of Criminal Appeals held that
sufficiency of the evidence is to be measured by the elements of an offense as defined by a
hypothetically-correct jury charge. Malik, 953 S.W.2d at 240. The court wanted to ensure that the
standards for measuring sufficiency reserved acquittal for the situations where there was a failure
in proof of the crime rather than error in the charge. Id. While a conviction cannot be affirmed on
legal and factual grounds not submitted to a jury, when an indictment has been presented that
authorizes conviction on a particular ground and facts have been presented to a jury that are
sufficient to convict on that ground, it is not necessary that the jury charge itself have specifically
stated that ground in order for a conviction to be affirmed. Malik, 953 S.W.2d at 240; Swartz v.
State, 61 S.W.3d 781, 786 (Tex.App.--Corpus Christi 2001, pet. ref’d). We believe that the law of
parties as included under Section 7.02(b) was part of a hypothetically correct jury charge and was
properly raised by the evidence. 
            Appellant admitted entering into an agreement with Berkley to rob the victim. The evidence
demonstrates that the murder was committed in furtherance of the robbery. Because he knew
Berkley carried the gun, Appellant should have anticipated that murder was a possible result of the
robbery. See Flores v. State, 681 S.W.2d 94, 96 (Tex.App.--Houston [14th Dist.] 1984), aff’d by,
690 S.W.2d 281 (Tex.Crim.App. 1985)(where the defendant and a co-conspirator entered the
victim’s home with the intent to commit robbery, the victim was shot during the furtherance of the
robbery, and the defendant admitted that he knew the co-conspirator had a gun, the shooting could
have been anticipated); Holiday, 14 S.W.3d at 789-90 (where the defendant and three others planned 
an aggravated robbery, took a gun with them, and the defendant participated in the attack on the
victim, he should have anticipated a co-conspirator would commit murder in furtherance of the
robbery); Hanson, 55 S.W.3d at 686-92 (holding that the evidence was legally sufficient to sustain
the defendant’s conviction for capital murder because he knew about the plan to rob the victim by
hitting him over the head, the weapon was carried to the robbery in the defendant’s knapsack, and
the defendant retrieved the weapon after the murder); Patterson v. State, No. 08-99-00238-CR, 2000
WL 1681070, at *3, *5 (Tex.App.--El Paso Nov. 9, 2000, pet. ref’d)(not designated for publication)
(finding the evidence legally and factually sufficient to sustain a capital murder conviction when the
defendant admitted to an agreement to rob the victim, carried the gun used in the murder, pushed the
victim out of the vehicle after the murder, and assisted in destroying evidence of the murder). 
Consequently, we reject Appellant’s argument that Berkley’s action in kidnaping, raping, and
murdering Sophia was an “independent impulse” and conclude that a rational jury could have found
the essential elements of capital murder beyond a reasonable doubt under a conspiracy theory. We
overrule Points of Error Nos. One and Two.
INSTRUCTION AS TO PARTY LIABILITY
            In Point of Error No. Three, Appellant complains that the charge did not instruct the jury that
the shooting of Sophia had to be foreseen or foreseeable. He maintains that because the charge
referenced only Section 7.02(a), it broadened his liability for any and all actions of the co-defendant
committed during the course of the crime that Appellant agreed to commit. 
            In arguing that the jury charge must track the language of Section 7.02(b), Appellant relies
upon Solomon v. State, 49 S.W.3d 356, 368 (Tex.Crim.App. 2001). There, the defendant contended
that the trial court erred in failing to submit a requested independent impulse instruction. Id. at 367. 
The court decided that since “independent impulse” would simply negate the conspiracy liability
element, then all that was required was for the appropriate portions of the jury charge to track the
language of Section 7.02(b). Id. Simply stated, an independent impulse instruction is not required
if the application paragraph tracks the statutory language. Here, the jury was charged under Section
7.02(a). The charge under Section 7.02(b) is merely an alternative charge. See Montoya v. State,
810 S.W.2d 160, 165 (Tex.Crim.App. 1989), cert. denied, 502 U.S. 961, 112 S.Ct. 426, 116 L.Ed.2d
446 (1991). Appellant cites no authority--and we have found none--requiring that the jury be
charged under both theories included in Section 7.02. 
            Appellant’s next complaint relates to the following portion the charge:
 
[I]f you believe from the evidence beyond a reasonable doubt . . . that WILLIAM
BERKLEY did . . . knowingly cause the death of . . . SOPHIA MARTINEZ . . . and
[Berkley] was then and there in the course of committing or attempting to commit the
offense of aggravated robbery . . . and if you further believe from the evidence 
beyond a reasonable doubt . . . that MICHAEL JACQUES . . . solicits, encourages,
directs, aids or attempts to aid [Berkley] in the foregoing action . . . .

Appellant argues that the use of the words “foregoing action” instead of “foregoing murder” allowed
the jury to use either the murder or the robbery to convict Appellant, while robbery alone would not
support a conviction for capital murder. He provides no authority for his proposition. The function
of the jury charge is to instruct the jury on the law applicable to the case. Dinkins v. State, 894
S.W.2d 330, 339 (Tex.Crim.App. 1995), cert. denied, 516 U.S. 832, 116 S.Ct. 106, 133 L.Ed.2d 59
(1995). When we consider charge error, the first inquiry is whether an objection was lodged at trial. 
Where, as here, an objection was duly made, we must determine whether error actually exists in the
charge, and whether any resulting harm requires reversal. Almanza v. State, 686 S.W.2d 157, 171-72
(Tex.Crim.App. 1985). Reversal is required only if the error was calculated to injure the rights of
the defendant. Id. at 171. We must examine the error in light of the entire jury charge, the state of
the evidence, including the contested issues and weight of the evidence, the argument of counsel,
and any other relevant information revealed by the record of the trial court as a whole. Id.             The charge specified that Appellant was indicted for capital murder. It defined “capital
murder,” “intent,” and “in the course of committing aggravated robbery.” The charge also provided
that “[a] person is criminally responsible for an offense committed by the conduct of another if,
acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs,
aids or attempts to aid the other person to commit the offense.” Reading the definitions, applicable
law, and the application paragraph together, and having found the evidence to be both legally and
factually sufficient to convict Appellant of capital murder, we find no error. Point of Error No.
Three is overruled.
EVIDENTIARY ERROR
            In Point of Error No. Four, Appellant argues that the trial court erred in admitting metal
fragments because they were not relevant. As we detailed in the factual summary, fragments were
found in the apartment where Appellant resided at the time of the murder. He contends that he had
no connection to the apartment when the fragments were found, that no expert conclusively stated
the fragments were in fact a bullet, that there was no evidence how or when the fragments came to
be in the apartment, and that any relevance was based upon an improper stacking of inferences. 
Relevancy
            Relevant evidence is “evidence having any tendency to make the existence of any fact that
is of consequence to the determination of the action more probable or less probable than it would
be without the evidence.” Tex.R.Evid. 401. Relevancy is not an inherent characteristic of any item
of evidence but exists as a relation between an item of evidence and a matter properly provable in
the case. Montgomery v. State, 810 S.W.2d 372, 375 (Tex.Crim.App. 1990). The evidence need not
by itself prove or disprove a particular fact in order to be relevant. Id. at 376. It is sufficient if the
evidence provides even a small nudge toward proving or disproving some consequential fact. Id. 
Standard of Review
            Finding a piece of evidence to be relevant is the first step in a trial court’s determination of
whether the evidence should be admitted before the jury. Contreras v. State, 915 S.W.2d 510, 518
(Tex.App.--El Paso 1995, pet. ref’d), citing Montgomery, 810 S.W.2d at 375; Levario, 964 S.W.2d
at 296-97. The admissibility of evidence falls within the trial court’s discretion. Duckett v. State,
797 S.W.2d 906, 913 (Tex.Crim.App. 1990), overruled on other grounds, Cohn v. State, 849 S.W.2d
817 (Tex.Crim.App. 1993); Levario, 964 S.W.2d at 297. Questions of relevance should be left
largely to the trial court, relying on its own observations and experience, and we will not reverse
absent an abuse of discretion. Moreno v. State, 858 S.W.2d 453, 463 (Tex.Crim.App. 1993), cert.
denied, 510 U.S. 966, 114 S.Ct. 445, 126 L.Ed.2d 378 (1993); Montgomery, 810 S.W.2d at 391
(opinion on reh’g). As long as the trial court’s ruling was at least within the zone of reasonable
disagreement, we will not intercede. Montgomery, 810 S.W.2d at 391.
Objections and Testimony at Trial
            During the testimony of Officer Olivas, the State elicited information about lead fragments
recovered from apartment no. 34 at Amberwood. Some seven months after the murder, Olivas went
to the apartment looking for a bullet fragment or slug in the floor or carpet. The State offered
exhibits 72-78, which were pictures of the apartment, the carpet where the fragments were found,
and the fragments themselves. The defense objected on relevance grounds, and alternatively argued
that the evidence was more prejudicial than probative. The trial court engaged in the appropriate
balancing test and overruled the objection. 
            Appellant complains that the State’s firearm expert did not testify that the fragments were
fired from the gun recovered from Berkley’s parents’ house nor that they were related to the bullets
found during the autopsy or at the scene of the murder. He claims that no witness testified that the
fragment was in fact a bullet, why the police searched for the fragments, or how they were relevant
to this case. He further suggests that the State has merely speculated how the fragments got there
and how it proved Appellant’s intent to murder. Appellant specifically contends that the State made
the following inferences from the fact that fragments were recovered from his former apartment and
that the fragments were chemically similar to the bullets recovered from Sophia’s body: 
            • the fragment was a slug; 
            • the shot was made before the robbery; 
            • the shot was made within hours of the robbery; 
            • the shot was made to ensure the gun was loaded and worked properly; and 
            • Appellant was present when the gun was discharged. 
Appellant argues that if any of these inferences are untrue, then the fragments did not tend to move
the State’s case any closer to the truth. In other words, he maintains that the evidence was only
relevant if the inferences were stacked.
Stacking of Inferences
            A vital fact may not be established by stacking inference upon inference. See Richardson
v. State, 834 S.W.2d 535, 537 (Tex.App.--Houston [1st Dist.] 1992, pet. ref’d)(op. on reh’g). Basing
one inference upon another in order to reach a conclusion is not allowed. Lee v. State, 214 S.W.2d
619, 622 (Tex.Crim.App. 1948). However, the stacking prohibition has only been applied in
reviewing the sufficiency of the evidence, not in reviewing the admissibility of evidence. Perhaps
recognizing this limitation in Texas law, Appellant refers us to Ohio v. Cowans, 717 N.E.2d 298
(Ohio 1999) as authority for his argument.
            Cowans was convicted of murder by strangulation. Id. at 301-03. He contended that a
photograph showing a BB pistol in his truck was improperly admitted because the State’s theory as
to relevance of the pistol required the jury to draw an inference from another inference. Id. at 309. 
He argued that the State began with a fact--the absence of defensive wounds--and drew an inference
that the victim’s killer used a weapon to subdue her. Id. The State then inferred that the BB gun was
the weapon used. Id. The court found that in order for the gun to be connected to the crime, the
State had to infer that:
            • the defendant had possession of the gun; 
            • that he carried the gun to the victim’s house;
            • that he brandished the gun; and 
            • that the gun caused the victim to submit to Cowans during the murder. 
Id. The court concluded that absent any direct connection between the truck and the victim’s
residence, the fact that the gun was found in the truck did not support a reasonable inference that the
defendant had used the gun to intimidate the victim. Id. Consequently, the photograph of the gun
was erroneously admitted. 
            The State’s theory at trial was that the discovery of fragments in Appellant’s apartment
established that Appellant and Berkley test-fired the revolver, thus demonstrating Appellant’s intent.
We consider now the inferences.
            During their search, police discovered lead fragments under the carpet in the children’s
bedroom. Officer Olivas testified that from her experience in the field and course work the lead
pieces appeared to be bullet fragments. Sally Grew, a firearms and tool marks examiner for the FBI,
testified that the fragments were visually the same as the recovered bullets because some of the
fragments had the same brassy-colored coating as the bullets. Diana Grant from the FBI laboratory
division testified that the fragments were physically and analytically (chemically) indistinguishable
from the bullets recovered from Sophia’s body. 
            Appellant and his wife moved into apartment no. 34 in January 2000. Berkley lived there
with them until March 12 when Heather told Appellant to “kick him out” because she had learned
the robbery victim had died. Appellant moved out on March 28. Heather continued to live there
until July. Although not offered as evidence to the jury, the defense told the court that it was Berkley
who led police to search for the fragments. 
            While the record reveals that Heather did not allow guns inside the apartment because of the
children, it also shows that she was hospitalized on the day of the murder. Her children were staying
with relatives during her hospitalization and were not at the apartment at the time. 
            Appellant and Berkley were at the complex twice that night. The first time, Appellant
admittedly went to his own apartment because Heather needed some personal items. She estimated
that he was gone an hour and a half. The second time, they stopped there to visit Amanda Cepolski. 
She recalled Appellant and Berkley coming by her apartment in March 2000 and staying for fifteen
to twenty minutes. They left with a black sweatshirt and black beanie cap. Significantly, she said
nothing about a gun. The gun used to kill Sophia belonged to Berkley’s father, not Amanda. The
robbery scheme could have been hatched during the first visit to the apartments and the gun test-fired
at that time. Or the duo could have stopped by after leaving Amanda and before proceeding to scout
robbery locations. An analysis of the time line bears this out. Appellant left the hospital around
7 p.m. and got to the first location at 8:30 p.m. Officer Tony Tabullo testified that the driving
distance from the hospital to the apartment was approximately eighteen minutes. They talked to
Amanda for a maximum of twenty minutes. The drive from the apartment to the northeast GECU
was 2.5 miles. From this evidence, one would expect they would have arrived there around
7:45 p.m., but they didn’t arrive until some forty-five minutes later.
            Here, there was a weapon already connected to the crime; there was no dispute that Berkley
had the gun that evening. The fragments recovered from the apartment were similar both in
appearance and in chemical composition to those recovered from Sophia’s body. Appellant was
admittedly at the apartment once that evening and at the complex a second time. He has not
accounted for a sizeable portion of his own time line. All the jury had to infer was that he and
Berkley test-fired the weapon in contemplation of using it in the robbery. 
            The evidence had a tendency to make Appellant’s intent more probable than it would be
without the evidence. See Tex.R.Evid. 401. It need not by itself prove intent in order to be relevant. 
See id. Even assuming Cowans is applicable, it is distinguishable. We perceive no abuse of
discretion in the admission of the bullet fragments. Point of Error No. Four is overruled.
 

LESSER-INCLUDED OFFENSE
            The jury was charged on capital murder and the lesser included offense of aggravated
robbery. In Point of Error No. Five, Appellant argues that the trial court erred in failing to charge
the jury with the lesser-included offenses of murder or felony murder.
            To determine whether Appellant was entitled to a charge on the lesser included offenses, we
apply a traditional two-prong test. See Bignall v. State, 887 S.W.2d 21, 23 (Tex.Crim.App. 1994);
Rousseau v. State, 855 S.W.2d 666, 672-73 (Tex.Crim.App.), cert. denied, 510 U.S. 919, 114 S.Ct.
313, 126 L.Ed.2d 260 (1993); Royster v. State, 622 S.W.2d 442, 446 (Tex.Crim.App. 1981);
Bartholomew v. State, 882 S.W.2d 53, 54-55 (Tex.App.--Houston [14th Dist.] 1994, pet. ref’d);
Ramirez v. State, 976 S.W.2d 219, 226-27 (Tex.App.--El Paso 1998, pet. ref’d). First, the lesser
included offense must be included within the proof necessary to establish the offense charged.
Bignall, 887 S.W.2d at 23; Ramirez, 976 S.W.2d at 227. Second, some evidence must exist in the
record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of
the lesser offense. Ramirez, 976 S.W.2d at 227. The credibility of the evidence and whether it
conflicts with other evidence or is controverted may not be considered in making the determination
of whether the lesser-included offense should be given. See Gadsden v. State, 915 S.W.2d 620, 622
(Tex.App.--El Paso 1996, no pet.); Barrera v. State, 914 S.W.2d 211, 212 (Tex.App.--El Paso 1996,
pet. ref’d). Regardless of its strength or weakness, if any evidence raises the issue that the defendant
was guilty only of the lesser offense, then the charge must be given. Saunders v. State, 840 S.W.2d
390, 391 (Tex.Crim.App. 1992). An accused is guilty only of a lesser included offense if there is
evidence that affirmatively rebuts or negates an element of the greater offense, or if the evidence is
subject to different interpretations, one of which rebuts or negates the crucial element. See Ramirez,
976 S.W.2d at 227. It is not enough that the jury may disbelieve crucial evidence pertaining to the
greater offense. See Skinner v. State, 956 S.W.2d 532, 543 (Tex.Crim.App. 1997), cert. denied, 523
U.S. 1079, 118 S.Ct. 1526, 140 L.Ed.2d 677 (1998). There must be some evidence directly germane
to the lesser-included offense for the jury to consider before an instruction on the lesser included
offense is warranted. See Ramirez, 976 S.W.2d at 227. Murder
            Murder is a lesser included offense of capital murder. Cantu v. State, 939 S.W.2d 627, 647
(Tex.Crim.App.), cert. denied, 522 U.S. 994, 118 S.Ct. 557, 139 L.Ed.2d 399 (1997). For a rational
jury to find that Appellant was guilty only of murder, some evidence must exist in the record that
Appellant did not commit the robbery or did not kill during the commission of or in the immediate
flight from committing robbery. See id. at 648. 
            Appellant argues that the evidence would support a jury finding that he did not intentionally
kill Sophia because he did not foresee Berkley’s decision to kidnap and rape Sophia, and he did not
aid in the kidnap or rape, which were the felonies during which the murder occurred, not during the
robbery. 
            The jury was charged that Appellant was a party to capital murder as a result of his
participation in the aggravated robbery, not the kidnaping or rape. In addition, Appellant did not
controvert the fact that he participated in the aggravated robbery. In his statement, he said that he
and Berkley agreed to hold up someone at an ATM. Thus, a rational jury could not have concluded
that Appellant did not participate in the robbery, and Appellant was not entitled to a lesser included
charge of murder.
 

Felony Murder
            Felony murder is a lesser included offense of capital murder. Rousseau, 855 S.W.2d at 673,
citing Creel v. State, 754 S.W.2d 205, 211 (Tex.Crim.App.1988). “The distinguishing element
between felony murder and capital murder is the intent to kill.” Fuentes v. State, 991 S.W.2d 267,
272 (Tex.Crim.App.), cert. denied, 528 U.S. 1026, 120 S.Ct. 541, 145 L.Ed.2d 420 (1999). Capital
murder includes an intentional murder committed during the course of committing one of the
enumerated offenses in the statute. Id. A felony murder includes an unintentional murder committed
during the course of a felony. Id. In felony murder the culpable mental state is supplied by the
underlying felony. Id. Appellant, as a party, was entitled to a charge on felony murder if there were
some evidence that would permit a jury rationally to find that Berkley, the principal actor, intended
only to rob Sophia, not to cause her death. See Rousseau, 855 S.W.2d at 673; see also Santana v.
State, 714 S.W.2d 1, 9-10 (Tex.Crim.App. 1986)(holding that when the evidence shows that
whoever did the killing did so intentionally, a charge on felony murder need not be given); Hozaifeh
v. State, No. 14-95-00291-CR, 1997 WL 445802 (Tex.App.--Houston [14th Dist.] Aug. 7, 1997, pet.
ref’d)(not designated for publication), cert. denied, 523 U.S. 1140, 118 S.Ct. 1846, 140 L.Ed.2d
1095 (1998), citing Santana and finding that when the evidence shows that whoever did the killing
did so intentionally, a charge on felony murder need not given; Velasquez v. State, No. 05-95-01596-CR, 1997 WL 524156 (Tex.App.--Dallas Aug. 26, 1997, pet. ref’d)(not designated for publication)
(finding that the state of mind of the actor who causes the death determines whether the offense is
capital murder or felony murder). 
            The jury charge authorized the jury to convict Appellant as a party to capital murder. It
directed the jury that it must find that Berkley intentionally and knowingly caused Sophia’s death
in the course of the aggravated robbery and that Appellant was a party to the offense. In his
statement to police, Appellant said that Berkley realized that Sophia had been shot in the face at the
ATM. Berkley told Appellant that he drove Sophia to a secluded area, told her to get out of the car,
and shot her in the face twice. When Sophia fell to the ground, Berkley emptied the gun into her. 
Sophia suffered five gunshot wounds, three of which were fatal. Appellant neither contended that
Berkley’s killing of Sophia was unintentional, nor did the evidence establish it. As a party,
Appellant was not entitled to a charge on the lesser-included offense of felony murder. Point of
Error No. Five is overruled. Having overruled all issues for review, we affirm the judgment of
conviction.
 
August 12, 2004                                                          
                                                                                    ANN CRAWFORD McCLURE, Justice

Before Panel No. 4
Barajas, C.J., Larsen, and McClure, JJ.

(Do Not Publish)